Filed 5/12/21  In re R.A. CA6

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| In re R.A., a Person Coming Under the Juvenile Court Law. | H047451 (Santa Clara County Super. Ct. No. JV42287) |
| THE PEOPLE, Plaintiff and Respondent, v. R.A., Defendant and Appellant. | |

After the minor, R.A., admitted allegations that he violated his probation and committed two second-degree robberies (Pen. Code, § 212.5, subd. (c)), the juvenile court declared him a ward of the court pursuant to Welfare and Institutions Code section 602[1] and committed him to the Department of Corrections and Rehabilitation, Division of Juvenile Justice (DJJ) for a maximum term of 10 years eight months.

On appeal, R.A. contends that the juvenile court abused its discretion by committing him to the DJJ rather than placing him in a less restrictive setting.  He also argues that the juvenile court miscalculated his maximum term of confinement by two months and that the authorized term is 10 years six months.  In a supplemental opening brief, R.A. argues that he is entitled to the ameliorative effect of Senate Bill No. 823 (Stats. 2020, ch. 337, §§ 28, 53) which would further reduce his maximum term of

[1] Unspecified statutory references are to the Welfare and Institutions Code.

confinement by two years, i.e., to eight years six months.  The Attorney General argues that there was no abuse of discretion in committing R.A. to the DJJ but concedes that his maximum term of confinement must be reduced due to both the juvenile court's initial miscalculation and by operation of Senate Bill No. 823.

We find that the juvenile court did not abuse its discretion in committing R.A. to the DJJ.  However, we agree with R.A. and the Attorney General that the juvenile court miscalculated R.A.'s maximum term of confinement and that R.A. is entitled to retroactive application of Senate Bill No. 823.  We will modify the dispositional order to reflect that R.A.'s maximum period of commitment is eight years and six months and, as modified, we will affirm.

## I.  FACTUAL AND PROCEDURAL BACKGROUND

### A.  *Procedural Background*

In March 2017, the Santa Clara County District Attorney (district attorney) filed a section 602 juvenile wardship petition (Petition A) alleging that R.A. had committed one count of felony robbery (Pen. Code, §§ 211, 212.5, subd. (c); count 1) and one felony count of unlawfully taking a vehicle (Veh. Code, § 10851; count 2).  A second section 602 petition (Petition B) was filed in May 2017 alleging that R.A. committed several offenses, specifically:  (1) felony vehicle theft (Veh. Code, § 10851; count 1); (2) misdemeanor hit and run (Veh. Code, § 20002, subd. (a); count 2); (3) misdemeanor unlawful evasion of a police officer in a vehicle (Veh. Code, § 2800.1, subd. (a); count 3); (4) misdemeanor resisting arrest (Pen. Code, § 148, subd. (a)(1); count 4); (5) misdemeanor possession of burglary tools (Pen. Code, § 466; count 5); and (6) misdemeanor receipt of stolen property (Pen. Code, § 496, subd. (a); count 6).

On May 25, 2017, the juvenile court sustained an attempted felony robbery allegation (amended count 1) in Petition A and all of the allegations set forth in Petition B.  Following a dispositional hearing on both petitions, R.A. was adjudged a ward of the court and placed on formal probation, subject to several conditions including

that he serve 45 days in the electronic monitoring program (EMP) and participate in Wraparound services.

On June 23, 2017, the probation department filed Petition C under section 777 alleging that R.A. violated his probation and the district attorney filed a section 602 petition (Petition D) alleging that R.A. committed felony vehicle theft (Veh. Code, § 10851; count 1); felony hit and run (Veh. Code, § 20001; count 2); and misdemeanor receipt of stolen property (Pen. Code, § 496, subd. (a); count 3). At the July 10, 2017 jurisdictional hearing, the juvenile court sustained the probation violation allegation in Petition C, but dismissed the charges in Petition D. Following the July 24, 2017 dispositional hearing, R.A. was continued as a ward of the court and placed on formal probation again. As conditions of probation, he was ordered to serve 60 days on EMP and to continue to participate in Wraparound services.

In Petition E, filed on August 15, 2017, the probation department alleged that R.A. violated his probation (§ 777) by being failed from EMP. R.A. admitted the allegations in Petition E and he was ordered to remain in the juvenile hall pending disposition. At his August 30, 2017 disposition, the court released R.A. from detention and ordered that he attend the Providing Education Alternatives and Knowledge (PEAK) program and continue with Wraparound Services.

On September 21, 2017, the district attorney filed a section 602 petition (Petition F) alleging that R.A. committed attempted felony vehicle theft (Pen. Code, § 664, Veh. Code, § 10851, subd. (a); count 1) and misdemeanor possession of burglary tools (Pen. Code, § 466). The juvenile court sustained Petition F on October 19, 2017 and, following the November 2, 2017 dispositional hearing, the court returned R.A. to the PEAK program.

On November 13, 2017, the district attorney filed a section 602 petition (Petition G) alleging that R.A. committed two counts of felony robbery (Pen. Code, §§ 211, 212.5, subd. (c); counts 1 & 3) and one misdemeanor count of receiving stolen

3

property (Pen. Code, § 496d; count 2).  On November 28, 2017, R.A. admitted one count of attempted felony robbery (amended Count 1) and the misdemeanor count (Count 2). R.A. stipulated to provide restitution for the property stolen in the second robbery and the juvenile court dismissed that count (Count 3).

At the December 20, 2017 dispositional hearing, the court continued R.A.'s wardship and committed him to the Santa Clara County Juvenile Rehabilitation Facilities (JRF), Enhanced Ranch Program for six to eight months.  R.A. completed the custodial portion of his JRF commitment on August 3, 2018 and entered the 10-week Aftercare portion of the program.  However, R.A. was returned to JRF custody on September 28 and October 26 for violating the Aftercare rules.  On December 4, 2018, R.A. "was deemed a [JRF] failure when he absconded from [p]robation supervision."

On December 5, 2018, the probation department filed a petition under section 777 (Petition H) alleging that R.A. violated his probation by failing to obey JRF rules and absconding from probation supervision.  The juvenile court issued a bench warrant the following day.

On March 14, 2019, the district attorney filed a section 602 petition (Petition I) alleging that R.A. committed two counts of felony robbery (Pen. Code, § 212.5, subd. (c), counts 1 & 2).  At the April 25, 2019 jurisdictional hearing, R.A. admitted the allegations in both Petitions H and I.

After a contested dispositional hearing, the juvenile court issued a written statement of decision adopting the probation department's recommendation and committing R.A. to the DJJ.  The juvenile court declared that R.A.'s maximum confinement time was 10 years eight months with custody credits of 613 days.  His maximum period of confinement pursuant to section 731, subdivision (c), was calculated at nine years.

R.A. timely appealed.

4

## B. *Factual Background*

### 1. *The Probation Violation and Robberies*[2]

On August 3, 2018, R.A. completed the custodial portion of his JRF commitment and was released onto the 10-week Aftercare portion of the program. However, before completing Aftercare, he was twice returned to the JRF—on September 28, 2018 and October 26, 2018—for various rules violations, such as breaking curfew, failing to meet with his WRAP team, and failing to attend school. R.A. was deemed a JRF failure on December 4, 2018, after he absconded from probation supervision.

On December 9, 2018, San Jose police responded to a report of a purse–snatching robbery in the parking lot of a grocery store. According to the police report, the 71-year-old victim was standing by the trunk of her vehicle when the suspect, later identified as R.A., came up behind her and grabbed her purse. The victim tried to hold onto her purse as R.A. pulled it from her grasp. In the process, the victim spun around and fell to the ground, hitting her head. She suffered a contusion and cuts on both hands. R.A. made off with the purse, which "contained a cellular phone, credits cards, a check book, a social security card, and approximately $500.00 in cash." There were two witnesses who reported that R.A. hopped into a vehicle waiting nearby. "The witnesses attempted to follow the vehicle but stopped as the vehicle accelerated to speeds of 100 miles per hour."

Approximately five minutes after the first robbery, police responded to another purse-snatching robbery at a different parking lot in San Jose. The 59-year-old victim was sitting in the driver's seat of her vehicle with her purse on the front passenger seat. She noticed a black vehicle pull behind her. R.A. got out of the black vehicle and approached the victim's vehicle. He opened the victim's passenger door and grabbed her purse. The victim tried to hold on, but R.A. pulled it away from her, causing a minor

---

[2] Since R.A. admitted the allegations in Petitions H and I, we derive the facts from the probation officer's March 15, 2019 detention hearing report.

injury to the victim's left ring finger. R.A. got back into the black vehicle which drove away.

Police took fingerprints from the victim's vehicle and those were submitted to the Central Identification Unit (CIU) for analysis. "The CIU report indicated the fingerprints recovered at the scene matched those of [R.A.]."

### 2. *The Probation Officer's June 20, 2019 Dispositional Report*

R.A.'s probation officer, Noreen Ryan, prepared the June 20, 2019 dispositional report, in which she recommended that R.A. be committed to the DJJ. In her report, Ryan noted that R.A. had been screened for placement but was not accepted due to "his level of criminal sophistication and threat to community safety."

The report recounted in detail R.A.'s performance both before and after being found a ward of the court, noting his numerous violations of EMP by leaving home without permission, failing to attend school, and committing further offenses. The report also described his failure to engage with the therapy and WRAP services offered to him.

R.A. entered the JRF program in December 2017, but his behavior in that program was mixed. After he completed the custodial portion of the program in August 2018, he was placed on the Aftercare portion. However, while on that program, R.A. "immediately tested positive for marijuana, absconded from parental supervision on several occasions, did not remain in contact with his Aftercare counselor, and had poor school attendance." As a result, R.A. was twice returned to the JRF "to re-assess his case plan and allow him time to regroup." "Unfortunately, even after being returned to the community, [R.A.] continued to refuse to comply with his Court Orders or engage with services." On December 5, 2018, R.A. absconded from Aftercare.

R.A. was ultimately taken into custody on March 12, 2019, for violating his probation as alleged in Petition H and for the two robberies alleged in Petition I. During his subsequent detention in juvenile hall, R.A. refused to follow staff instructions, and also cursed at staff while throwing gang signs and making threats, "such as '187 on a

6

rookie.' "[3] Staff reported that R.A. "has consistently been disrespectful to staff, challenges directives, [and] refuses to comply with simple instructions."

Per the report, R.A. was involved in one referral to the Department of Family and Children's Services for general neglect concerns in 2015, but that referral was deemed inconclusive. However, the probation officer noted that it was "safe to assume" that R.A. experienced some trauma due to his father's drug use.

Analyzing R.A.'s "adjustment under supervision," Ryan wrote that, despite "numerous opportunities to succeed on [p]robation and in the community," R.A. failed to take advantage of the services provided and "continued to commit acts of delinquency and victimize innocent people." R.A. was involved in four sustained robberies, all incidents where he grabbed women's purses, with the victims ranging in age from 49 to 71. He committed the most recent two robberies four days after absconding from Aftercare. In one of those instances, R.A. fled the scene in a vehicle that, as it was pursued, reached speeds of 100 miles per hour.

Ryan noted that she had a telephone consultation on May 15, 2019, with DJJ parole agent Lorraine Custino in order to pre-screen R.A. for a DJJ commitment. Based on her consultation with Custino, Ryan opined that a "DJJ commitment is the most viable [d]ispositional option for [R.A.] at this time," based on the "level of structure and security" as well as the "wide range of educational, therapeutic[,] and rehabilitative services" it would provide. Ryan based this opinion on R.A.'s failure to take advantage of the opportunities provided under supervision, his ongoing commission of "serious felonious acts," and her "belief his crimes will continue to escalate in severity."

Ryan detailed the various programming and services available at the DJJ which would meet R.A.'s needs, beginning with the treatment goals developed on intake "based on the outcome of the California Youth Assessment & Screening Instrument (CA-YASI),

---

[3] Staff understood this to be a reference to Penal Code section 187 which defines the crime of murder.

7

and the youth's committed offense." The report indicated that the DJJ offered various "Cognitive Behavioral Intervention Strategies" which could assist R.A., including "Aggressive Interruption Training (AIT), . . . a 10-week program that improves social skill competence, anger control, and moral reasoning; Cognitive Behavioral Interventions for Substance Abuse (CBI-SA), . . . a 38-session curriculum with an emphasis on building skills and strategies for avoiding substance abuse; Counter Point TM, . . . a 33-session program for male offenders that addresses anti-social attitudes and negative peer influences; Skill of the Week, which provides practice of 52 social skills (1 each week); and Advanced Practice, which provides additional and more rigorous practice of social skills learned during AIT and Skills of the Week sessions."

In addition, Ryan wrote that "family involvement and family counseling are encouraged at DJJ and the program follows a level system behavioral treatment plan, which includes positive reinforcement." R.A. would also be offered "intervention services, given his noted association with the 'Sureno Street Gang' as well as . . . Trauma Focused Behavioral Therapy to assist him" with any childhood trauma he may have endured.

In the event that R.A. obtained a high school diploma during his DJJ commitment, he would be "eligible for Career Technical Education (CTE) courses and college courses." R.A. could also participate in the Free Venture Program, in which "20% of his wages earned [during commitment] can be deducted and applied toward victim restitution owed."[4] After completing his commitment and being released on parole, the DJJ "Re-Entry Program ensures youth that leave the facility have a viable plan in place for reintegration back into their community to help reduce their risk of re-offending."

---

[4] Ryan pointed out in her report that 50 percent of the money "deposited in a Ward's trust account while serving a DJJ commitment is also applied towards their victim restitution accounts."

### 3. *The Disposition Hearing*

Ryan was the only witness to testify at R.A.'s contested disposition hearing. She began supervising R.A. in January 2018, at which time he had been committed to the JRF on Petition G.[5] In June 2017, the probation department used a risk assessment tool, the Juvenile Assessment and Intervention Service (JAIS), to identify R.A.'s particular needs. This initial JAIS described R.A. as fitting into the category of "environmental structure." Youths in this category are characterized by a "lack of social skills, . . . immaturity, . . . [are] easily manipulated . . . and influenced by others." Ryan testified that "academic failure is common for" such youth who usually have cognitive limitations, but they "may appear more intelligent or sophisticated because of their ability to copy others." A JAIS reassessment, conducted in December 2017, noted that mental health was a "significant need" for R.A., and further noted his continued issues with "social skills and poor cognitive function." Ryan testified on cross-examination that probation is not required to "impose everything" suggested in a JAIS.

The probation department referred R.A. for a psychological evaluation in October 2017. The evaluator noted mild impairment in R.A.'s executive functioning, and "difficulty with impulse control and/or decision-making especially in more complex or ambiguous situations." Based on a discrepancy in R.A.'s verbal and non-verbal performance scores, the evaluator indicated R.A. may have a "learning problem which will need to be further explored." The evaluator recommended that R.A. "be evaluated by a psychiatrist to rule out ADHD to address his significant difficulties with impulse control" and determine if his impulsivity, anxiety, and substance abuse issues could be addressed with medication. The evaluator also wrote that R.A. would benefit from a behavioral management plan to address hyperactivity and impulsivity. The probation department did not order special education testing for R.A. and he did not have an IEP or

---

[5] A different probation officer supervised R.A. on Petitions A through F.

behavioral management plan. However, in Ryan's opinion, R.A.'s educational problems were because "he did not want to go to school." The psychologist's report did not diagnose R.A. with ADHD or refer to posttraumatic stress disorder.

Ryan testified that R.A. was screened for a less restrictive or local placement, but he was denied because of the adjudicated offenses. "In the past," Ryan was aware "of other minors with . . . similar charges" who were given placements, including the JRF. On cross-examination, Ryan indicated that, at the time of the hearing, "[p]lacement is . . . being looked at in a different way" with "less criminally sophisticated" minors who present "less danger to society" accepted into "shorter programs closer to home." The court took judicial notice of changes in the law which eliminated "the long term placement option."

Ryan testified that, from "prior to petition A" until he was committed to the JRF, R.A. was provided services through the Wraparound Program, which included therapy, a family specialist, a parent partner, and a gang specialist. R.A. was classified as a gang associate from the outset of his supervision, and while at the JRF, he admitted to Ryan that he was a gang member. During his JRF commitment, R.A. was involved in two gang-related fights, and during his present detention he "was seen throwing up gang signs and threatening staff."

### 4. *The Juvenile Court's Statement of Decision*

In its August 29, 2019 statement of decision, the juvenile court set forth the applicable legal standards before summarizing the procedural history of the case, the dispositional reports prepared by Ryan, and Ryan's testimony. The juvenile court expressly found that Ryan was "an excellent and very credible witness" who was "knowledgeable, insightful, and . . . very well-prepared."

10

The juvenile court's decision indicated that the "general principles and analysis" of the statutory criteria applicable to juvenile transfer hearings (§ 707, subd. (a)(3))[6] "may assist [it] in determining whether a young person" should be committed to the DJJ or the JRF. The juvenile court also acknowledged that a decision to commit a minor to the DJJ must be supported by "substantial evidence that less restrictive alternatives are ineffective or inappropriate, as well as evidence in the record demonstrating a probable benefit to the minor by the . . . commitment. (Welf. & Inst. Code, § 734.)"

With respect to the criminal sophistication criterion (§ 707, subd. (a)(3)(A)), the juvenile court found that R.A.'s "repetitive choice of older female victims suggests a degree of sophistication, i.e., a common plan to victimize individuals perceived as easy targets. As to the likelihood of rehabilitation (§ 707, subd. (a)(3)(B)), the juvenile court found there was still time for R.A. to be rehabilitated before jurisdiction expired. R.A.'s prior delinquent history and history of prior attempts at rehabilitation (§ 707, subd. (a)(3)(C)-(D)) both militated against a less restrictive placement as well, with the court noting that R.A. continued his pattern of criminal behavior while subject to probation supervision, demonstrating an "unwillingness to engage [in services]" and a "history of absconding." Finally, the circumstances and gravity of R.A.'s most recent offenses (§ 707, subd. (a)(3)(E)) were serious, and R.A. committed these robberies, which resulted in trauma and physical injury to the victims, just four months after completing his JRF commitment.

The juvenile court then discussed the evidence demonstrating a probable benefit of committing R.A. to the DJJ. Although the court expressed its "concern" that neither party provided an "in-court witness as to what services DJJ can provide the minor," it

_____

[6] The criteria can be summarized as follows: (1) The minor's degree of criminal sophistication; (2) whether the minor can be rehabilitated before the juvenile court's jurisdiction expires; (3) the minor's previous delinquent history; (4) the success of prior attempts at rehabilitation; and (5) the circumstances/gravity of the offense(s) alleged in the current petition. (§ 707, subd. (a)(3).)

11

relied on Ryan's description of the DJJ programs which would benefit R.A. based on her consultation with Custino. The juvenile court's decision includes a graph correlating "[R.A.]'s Needs" as identified by the JAIS evaluation with the "DJJ Programs to Address [R.A.'s] Needs." In that graph, the juvenile court indicated that R.A.'s: (1) "[m]ental health" would be served by the DJJ "[y]outh assessment screening"; (2) "[s]ocial skills adequacy" would be addressed by a 10-week "Aggressive Interception Training (AIT)" program; (3) issues with "[p]eer relationships" and "[c]riminal orientation" would be served by the 33-week "Counterpoint$^{TM}$ Program"; (4) "[d]rug and alcohol issues" would be addressed by a 38-week program called "Cognitive Behavioral Intervention for Substance Abuse (CBI-SA)"; (5) "[t]rauma" would be addressed by "[f]ocused behavioral therapy"; and (6) "[e]ducation" would be addressed by "[c]areer technical education."

The juvenile court adopted "Ryan's recommendations of commitment to the [DJJ]" and found that "a less restrictive placement is ineffective and inappropriate." The juvenile court expressly noted that, in reaching this conclusion, it "weigh[ed] the five categories of analysis and consider[ed] the totality of [R.A]'s behaviors, including the incident reports from Juvenile Hall."

## II. DISCUSSION

### A. *Abuse of Discretion in DJJ Commitment*

R.A. argues the trial court abused its discretion in committing him to the DJJ because there was not substantial evidence that such a commitment would be a probable benefit to him. Specifically, R.A. contends that both the dispositional reports and Ryan's testimony were far too "vague . . . in addressing whether DJJ can provide a probable benefit as to [his] specific cognitive, mental health and gang involvement needs." We disagree.

12

### 1. *Applicable Legal Principles*

When a minor is adjudged a ward of the juvenile court, "the court may make any reasonable orders for the care, supervision, custody, conduct, maintenance, and support of the minor." (§ 727, subd. (a)(1).) In determining disposition, "the court shall consider, in addition to other relevant and material evidence, (1) the age of the minor, (2) the circumstances and gravity of the offense committed by the minor, and (3) the minor's previous delinquent history." (§ 725.5.) The court may also consider public safety. (§ 202, subd. (b).) The court has a wide range of options available for placing its wards, including probation, placement in a relative's home, foster home, licensed community care facility, or group home (see § 727, subd. (a)(4)); commitment to "a juvenile home, ranch, camp, or forestry camp" or "the county juvenile hall" (§ 730, subd. (a)(1)); or commitment to the DJJ (§ 731, subds. (a)(4), (c); see *People v. Superior Court* (*Lara*) (2018) 4 Cal.5th 299, 306 (*Lara*)).

To commit a minor to the DJJ, the "court [must be] fully satisfied that the mental and physical condition and qualifications of the ward are such as to render it probable that he will be benefited by the reformatory educational discipline or other treatment provided by the [DJJ]." (§ 734; see also *In re Eddie M.* (2003) 31 Cal.4th 480, 488 ["court must find that [the DJJ] would likely benefit the ward"].) In addition, "the record must show that less restrictive alternatives would be ineffective or inappropriate." (*Lara*, *supra*, 4 Cal.5th at p. 306.) However, "[n]othing bars [the DJJ] for . . . wards who have received no other placement." (*Eddie M.*, *supra*, at p. 488.)

We review a juvenile court's decision to commit a minor to the DJJ for abuse of discretion. (*In re Michael D.* (1987) 188 Cal.App.3d 1392, 1395.) "We must indulge all reasonable inferences to support the decision of the juvenile court and will not disturb its findings when there is substantial evidence to support them." (*Ibid.*) A reviewing court must examine the evidence at the disposition hearing in light of the purposes of the juvenile court law. (*Ibid.*) Those purposes include (1) the protection and safety of the

13

public, and (2) rehabilitation of the minor through care, treatment and guidance which is consistent with the minor's best interest, holds the minor accountable for his or her behavior, and is appropriate for the circumstances. (§ 202, subds. (a), (b) & (d).) The court may also consider punishment that is consistent with rehabilitative purposes and a restrictive commitment as a means of protecting public safety. (See *id.*, subd. (b); *Michael D.*, *supra*, at p. 1396; *In re Christopher B.* (2007) 156 Cal.App.4th 1557, 1564.)

### 2. *Substantial Evidence Supports the Juvenile Court's Decision*

In support of his argument, R.A. relies principally on *In re Carlos J.* (2018) 22 Cal.App.5th 1 (*Carlos J.*), in which the Court of Appeal found that the lower court's decision to commit the minor to the DJJ was not supported by substantial evidence. (*Id.* at pp. 10-15.) We readily distinguish *Carlos J.*

In *Carlos J.*, the 15-year-old minor admitted to assault with a firearm with a criminal street gang enhancement arising out of an incident in which he and a co-participant fired a number of shots at a member of a rival gang. (*Carlos J.*, *supra*, 22 Cal.App.5th at p. 4.) Prior to that offense, however, the minor "did not have a substantial record of involvement with the juvenile court system." (*Id.* at p. 7.)

The probation department recommended that the minor be committed to the DJJ after concluding that he was a threat to public safety and that he could receive gang intervention services at the DJJ. (*Carlos J.*, *supra*, 22 Cal.App.5th at pp. 8-9.) No witnesses testified at the disposition hearing, and the juvenile court was not provided with any information about specific services offered by the DJJ. (*Id.* at pp. 9, 14.) The juvenile court agreed with the probation department and committed the minor to the DJJ, but the First Appellate District reversed. (*Id.* at pp. 10-15.) The *Carlos J.* court held that "[i]n order for a juvenile court to make the determination of probable benefit . . . there must be *some* specific evidence in the record of the programs at the [DJJ] expected to benefit a minor." (*Id.* at p. 10.) *Carlos J.* also concluded that "[w]here a minor has

14

particular needs, the probation department should also include *brief* descriptions of the relevant programs to address those needs." (*Id*. at p. 12.)

Shortly after *Carlos J.*, the Fourth Appellate District issued *In re A.R.* (2018) 24 Cal.App.5th 1076 (*A.R.*) which also addressed the commitment of a minor to the DJJ. (*Id*. at p. 1078.) Relying in part on *Carlos J.*, *supra*, 22 Cal.App.5th 1, the minor in *A.R.* argued that his DJJ commitment was not supported by substantial evidence because the record lacked information about specific DJJ programs which would be of probable benefit to him. (*A.R.*, *supra*, at p. 1081.) The court found *Carlos J.* distinguishable, noting that unlike the minor in that case, the minor in *A.R.* "had a long history with the juvenile system and the juvenile court had already tried various less restrictive placements." (*Ibid*.) As a result, the juvenile court in *A.R.* properly focused on " 'criminogenic factors, the history presented, [and] the need for drastic measures,' along with the 'well of services available,' in concluding DJJ would meet [the minor's] rehabilitative goals." (*Ibid*.) Accordingly, there was substantial evidence of probable benefit to the minor from a DJJ placement. (*Ibid*.)

This case is more analogous to *A.R.* than *Carlos J.* Like the minor in *A.R.*, R.A. had a lengthy history of juvenile delinquency. R.A. had absconded from Aftercare four days before he committed the offenses that led to the current petition. Prior to absconding from Aftercare, R.A. had been returned to the JRF twice for violating Aftercare rules. The juvenile court took note of the "consistent and unfortunate pattern . . . of [R.A.] ignoring electronic monitoring conditions and not taking advantage of either the therapy options provided by Catholic Charities or the support provided by WRAP." R.A.'s performance on EMP was "consistently poor, as evidenced by multiple occasions of leaving the home without permission, continued marijuana use, and failure to attend school or being suspended from school." While awaiting disposition on the most recent petitions, R.A. was placed in juvenile hall where he threatened staff, threw gang signs, and "refuse[d] to comply with simple instructions."

"A juvenile court must determine if the record supports a finding that it is *probable* the minor will benefit from being committed to DJJ." (*In re Jonathan T.* (2008) 166 Cal.App.4th 474, 486.) "There is no requirement that the court find exactly how a minor will benefit from being committed to DJJ." (*Ibid.*) One benefit from a DJJ commitment is the secure environment. "In other words, it is not merely the programs at DJJ which [would] provide a benefit to [a] minor, but the secure setting as well." (*Ibid.*)

In this case, the juvenile court specifically listed R.A.'s needs, as identified by the JAIS, and cited particular DJJ programs that could potentially address those needs. The juvenile court expressly stated that R.A.'s escalating criminal behavior and the repeated failure of prior rehabilitative efforts demonstrated that "a less restrictive placement is ineffective and inappropriate." Because R.A. "had a long history with the juvenile system and the juvenile court had already tried various less restrictive placements[,] [t]he court properly focused on 'criminogenic factors, the history presented, [and] the need for drastic measures,' along with the 'well of services available' " in finding evidence of probable benefit. (*A.R.*, *supra*, 24 Cal.App.5th at p. 1081.)

Based on the record, substantial evidence supports the juvenile court's determination that it was probable that R.A. would benefit "by the reformatory educational discipline or other treatment provided by the [DJJ]." (§ 734.) Since substantial evidence supports the juvenile court's decision, no abuse of discretion occurred.

### B. Calculation of Maximum Confinement Time

#### 1. Miscalculation of Subordinate Term

R.A. next contends that his maximum confinement time should be eight years six months, instead of 10 years eight months. In his opening brief, R.A. argues the trial court erred in initially calculating his maximum confinement time by listing the amount of time attributable to his sustained adjudication for misdemeanor hit and run (Veh. Code,

§ 20002, subd. (a)) as four months instead of two months.  The Attorney General concedes the issue and we agree the concession is appropriate.

Section 726, subdivision (d)(3), provides in part, "If the court elects to aggregate the period of physical confinement on multiple counts or multiple petitions, including previously sustained petitions adjudging the minor a ward within Section 602, the 'maximum term of imprisonment' shall be the aggregate term of imprisonment specified in subdivision (a) of Section 1170.1 of the Penal Code."  Pursuant to Penal Code section 1170.1, subdivision (a), "The subordinate term for each consecutive offense shall consist of one-third of the middle term of imprisonment prescribed for each other felony conviction for which a consecutive term of imprisonment is imposed, and shall include one-third of the term imposed for any specific enhancements applicable to those subordinate offenses."

In this case, the juvenile court's calculation of R.A.'s maximum confinement time indicated that his commitment for misdemeanor hit and run (Veh. Code, § 20002, subd. (a)) would be a subordinate term of four months, implying a maximum term of 12 months for that offense.  However, the maximum sentence for misdemeanor hit and run is only six months (Veh. Code, § 20002, subd. (c)).  One-third of six months is two months, not four and thus R.A.'s maximum confinement time must be reduced by two months to correct this error.

### 2. *Senate Bill No. 823*

In a supplemental opening brief, R.A. claims that he is entitled to the ameliorative effect of Senate Bill No. 823 which would reduce his maximum confinement time by two years.  The Attorney General concedes this argument as well and we agree that the concession is appropriate.

At the time of R.A.'s disposition hearing, section 731, subdivision (c) provided, "The court shall not commit a ward to the Division of Juvenile Justice for a period that exceeds the *maximum* term of imprisonment that could be imposed upon an adult

17

convicted of the same offense." (Stats. 2018, ch. 766, § 1, italics added.) Thus, the court could lawfully set a term of confinement of up to five years for the principal offense of second-degree robbery pursuant to Penal Code section 212.5, subdivision (a).

However, after the court entered its dispositional order, the Legislature amended section 731, subdivision (c), effective September 30, 2020, and inoperative on July 1, 2021 (§ 731, subd. (d)), to change the phrase "*maximum* term of imprisonment" to "*middle* term of imprisonment." (Stats. 2020, ch. 337, § 28, italics added.)

As a result of this amendment, the juvenile court can set a maximum term of confinement for second-degree robbery of only three years, the middle term for that offense. (Pen. Code, § 212.5, subd. (a).) R.A.'s maximum time of confinement should therefore be reduced by two years. Since this appeal was pending when the amendment became effective in September 2020, R.A. is entitled to its ameliorative effect under *In re Estrada* (1965) 63 Cal.2d 740 and his maximum confinement time and maximum period of confinement must be reduced to eight years six months.

### III.   DISPOSITION

The dispositional order is modified to reflect a maximum confinement time and maximum period of confinement of eight years six months. As modified, the dispositional order is affirmed. The clerk of the superior court is ordered to forward a copy of the corrected abstract of judgment to the Department of Corrections and Rehabilitation, Division of Juvenile Facilities.

_____

Greenwood, P.J.

WE CONCUR:


_____

Grover, J.


_____

Danner, J.


People v. R.A.
No. H047451